UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARIE BURKS, as Personal Representative
of RICKY MILLS, deceased,

     Plaintiff,

v.                                  Case No. 6:08-CV-1568-ORL-28GJK
                                  **DISPOSITIVE MOTION**

KEVIN BEARY, as Sheriff of Orange County,
Florida, DEPUTY SHERIFF CHESTER
PARKER, and DEPUTY SHERIFF BRIAN
FIGUEROA,

     Defendants.

_____/

### DEFENDANTS, CHESTER PARKER'S AND BRIAN FIGUEROA'S, MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

COME NOW Defendants, DEPUTY SHERIFF CHESTER PARKER and DEPUTY SHERIFF BRIAN FIGUEROA, by and through their undersigned counsel, and file this Motion for Summary Judgment and Memorandum of Law in Support Thereof pursuant to Rule 56 of the Federal Rules of Civil Procedure for the reason that based on the record evidence before this Court, Defendants are entitled as a matter of law to Summary Judgment in their favor. As grounds therefore, Defendants will show unto this Court the following:

### I.      STATEMENT OF THE CASE

This action arises in connection with the fatal shooting of Ricky Mills by Orange County deputy sheriffs, CHESTER PARKER (hereinafter "Deputy Parker"), and BRIAN

FIGUEROA (hereinafter "Deputy Figueroa") and the alleged shooting injury of JACK

MILLS[1] (hereinafter know as Jack Mills) on June 14, 2005.  The lawsuit was initially

filed by MARIE BURKS, as personal representative of the Estate of Ricky Mills, against

KEVIN BEARY (hereinafter known as Sheriff Beary), as Sheriff of Orange County,

Florida, and Deputies Parker and Figueroa in their individual capacities.  However, on

February 2, 2009, the Complaint was amended to include a negligence count on behalf of

Jack Mills[1] against Sheriff Beary.

On June 14, 2005, Deputies Parker and Figueroa responded to a 911 call from

Mary Jones, in which Ms. Jones reported that Ricky Mills, a "mental patient", was

"threatening to hurt his uncle at Ms. Jones' residence which was also a boarding house.

Ricky Mills was a tenant at the residence.  Sheriff Beary was not present during this

incident and is only sued in his official capacity. Upon their arrival, Deputies Parker and

Figueroa were informed that Ricky Mills had a mental health condition and that he had

gone into his bedroom after threatening to get a knife and stab his uncle, Jack Mills.  The

deputies went to Ricky Mills' bedroom door to try and speak with him so that they could

assess the situation.  Initially, Ricky Mills refused to open the bedroom door as requested

by the deputies and instead was verbally hostile and yelling at the deputies.  The deputies

called for back-up assistance and a supervisor.  However, shortly after refusing to open

the door, Ricky Mills unexpectedly opened the bedroom door and stood in the doorway,

---

[1] Plaintiff, Jack Mills, alleges that he was shot by either Deputy Parker or Deputy Figueroa. However, Defendants deny that Jack Mills was shot and instead assert that any injury which Jack Mills suffered was a result of a knife being wielded by Ricky Mills.  This is an issue which will be addressed at trial if this case proceeds to trial.

stark naked, armed with a knife.  The deputies were standing on either side of the door when Ricky Mills opened the door.  As the deputies were within arm's length of Ricky Mills and the knife he was holding, the deputies perceived Ricky Mills as an imminent threat to themselves and possibly to himself or others.  Deputy Parker immediately deployed his electronic control weapon (sometimes loosely referred to as a "taser" and hereinafter referred to as "ECW").  The ECW appeared to have no impact on Ricky Mills who then began moving in the direction of Deputy Figueroa who began retreating.  Ricky Mills then ran after Jack Mills with the knife, and when Ricky Mills made contact with Jack Mills, they both fell to the floor.  Ricky Mills was on top of Jack Mills making stabbing motions.  In a rapidly evolving scenario, being forced to make split-second decisions, Deputies Parker and Figueroa shot and killed Ricky Mills.

Count I of the Amended Complaint alleges a 42 U.S.C. §1983 claim against Sheriff Beary, asserting that as a matter of policy or custom, Sheriff Beary engaged in inadequate screening, training and supervision of his deputies with deliberate indifference to the rights of individuals with whom deputies came into contact.  The Plaintiffs assert that Sheriff Beary's policies and customs resulted in the use of excessive force and/or unlawful use of deadly force, thereby depriving Ricky Mills of his constitutional rights. Counts II and III of the Amended Complaint are 42 U.S.C. §1983 claims against Deputies Parker and Figueroa in their individual capacity, alleging that they wrongfully used unreasonably excessive and deadly force against Ricky Mills in violation of Ricky Mills' constitutional rights.  Count IV of the Amended Complaint alleges a state law negligence claim against Sheriff Beary for the alleged wrongful death of Ricky Mills by

allegedly failing to use reasonable care in screening, hiring, training, supervising and disciplining deputies.   Counts V and VI are state law wrongful death claims against Deputies Parker and Figueroa for negligence in connection with the death of Ricky Mills. Count VII of the Amended Complaint is a state law negligence claim by Jack Mills against Sheriff Beary for injuries he allegedly received in connection with being shot in the foot by Deputies Parker and Figueroa which Jack Mills claims was a result of Sheriff Beary's alleged failure to properly screen, hire, train, supervise, and discipline deputies.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the Court is "satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56(c).   The substantive law applicable to the case ultimately determines which facts are material.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).   The party seeking summary judgment bears the initial burden of showing that there is an absence of a genuine dispute as to a material fact.   <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 323 (1986).   The moving party may satisfy his burden by showing that there is an absence of evidence to support the nonmoving party's case.   <u>Searcy v. City of Dayton</u>, 38 F.3d 282, 286 (6th Cir. 1994).   An issue is not genuine if unsupported by evidence, or if created by evidence which is "not significantly probative."   <u>Anderson</u>, at 250.   The Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party.   The Court is only compelled to make reasonable inferences in favor of a non-moving party.   <u>Tinker v. Beesley</u>, 429 F.3d 1324,

1326 (11th Cir. 2005).   The nonmoving party must do more than make conclusory allegations as to the material facts.   Rather, the nonmoving party must rebut any facts properly presented by way of affidavits or other evidence demonstrating the existence of a genuine and material issue of fact for trial.   Anderson, at 247-248.

### III.   STATEMENT OF MATERIAL UNDISPUTED FACTS

Although there may be various disputed issues of fact, the material undisputed issues of fact in the light most favorable to the Plaintiff for purposes of this Motion for Summary Judgment may be summarized as set forth below:

1.   Deputy Parker and Deputy Figueroa were duly appointed Deputy Sheriffs of the Orange County Sheriff and at all times material to the Amended Complaint were acting in the course and scope of their duties as Orange County deputy sheriffs on June 14, 2005, when they were called to respond to a residence located at 4549 Conley Street, Orlando, Florida, in reference to a reported attempted suicide and threats of violence. (Affidavits of Deputy Parker and Deputy Figueroa; transcript of 911 call from Mary Jones).

2.   Deputy Parker and Deputy Figueroa responded to the residence located at 4549 Conley Street, Orlando, Florida, in marked Orange County Sheriff's patrol cars wearing their Orange County Sheriff's uniform. (Affidavits of Deputy Parker and Deputy Figueroa).

3.   Immediately upon arriving at the above-referenced residence, Deputies Parker and Figueroa were advised that Ricky Mills, a "mental patient", had reportedly not

been taking his medication and had run into his bedroom threatening to get a knife and stab his uncle, Jack Mills.  (Affidavits of Deputies Parker and Figueroa).

4.      After being shown Ricky Mills' bedroom door, Deputy Parker and Deputy Figueroa stood on either side of Ricky Mills' door and attempted to persuade Ricky Mills to come out of his bedroom so that they could talk with him in order to assess the situation and to assess Ricky Mills' mental state.  (Affidavits of Deputies Parker and Figueroa).

5.      Initially, Ricky Mills refused to open the door to his bedroom and instead, yelled in a hostile manner for the deputies to leave the residence.  However, a short time later, Ricky Mills unexpectedly opened the door to his bedroom.  When he opened the door, he was naked and was holding a knife.   (Affidavits of Deputies Parker and Figueroa; deposition of Deputy Parker at pgs. 15-17; 20-23; deposition of Deputy Figueroa at pgs. 12-15).

6.      As Deputies Parker and Figueroa were within arm's length of Mr. Mills, when he opened the bedroom door holding the knife, both Deputy Parker and Deputy Figueroa were placed in immediate fear of serious bodily injury or death from Ricky Mills.  They were also concerned that Ricky Mills could injure himself or others with the knife.   (Affidavits of Deputy Parker and Deputy Figueroa and depositions of Deputy Parker at p. 23; and deposition of Deputy Figueroa at pgs. 15-17).

7.      Deputy Parker utilized his ECW on Ricky Mills in an effort to diffuse the situation while Deputy Figueroa began to retreat in an effort to create distance between himself and Ricky Mills.  Even though the prongs of the ECW struck Ricky Mills, the

ECW did not appear to Deputy Parker or Deputy Figueroa to have any impact on Ricky Mills. Ricky Mills then made movements with the knife which resulted in one of the ECW prongs being dislodged from his body. (Affidavits of Deputies Parker and Figueroa and deposition of Deputy Parker at pgs. 23, 27; and deposition of Deputy Figueroa at pgs. 16-17).

8. Upon opening the bedroom door and after having been tasered, Ricky Mills quickly turned towards Deputy Figueroa and began moving in Deputy Figueroa's direction as Deputy Figueroa retreated. Deputy Figueroa believed Ricky Mills was coming after him. However, shortly before actually reaching Deputy Figueroa, Ricky Mills quickly turned away and began moving in the direction of Jack Mills who was also in the residence. (Affidavits of Deputies Parker and Figueroa; deposition of Deputy Parker at pgs. 27-28, 37; and deposition of Deputy Figueroa at pgs. 19-21.

9. As Ricky Mills was approaching Jack Mills, both Jack Mills and Ricky Mills fell to the floor, and Ricky Mills began raising his arm in a manner which caused Deputy Figueroa and Deputy Parker to believe that Ricky Mills was attacking Jack Mills with the knife that the deputies had seen Ricky Mills with earlier. (Affidavits of Deputies Parker and Figueroa; deposition of Deputy Parker at pgs. 33-34; deposition of Deputy Figueroa at pgs. 19-22).

10. Deputy Island Baker and Deputy Craig Hall arrived at 4549 Conley Street, Orlando, Florida, to provide back-up assistance to Deputies Parker and Figueroa. When Deputies Hall and Baker entered the residence, they heard the sound of the ECW being deployed and within seconds thereafter, observed Deputies Parker, Figueroa and Jack

Mills appearing to retreat as they appeared to be trying to get away from Ricky Mills. According to Deputy Craig Hall, he observed Ricky Mills fall on Jack Mills as if he was tackling him and straddled him on the floor.   (Affidavit of Deputy Craig Hall; deposition of Deputy Hall at pgs. 19-21; 27-29; deposition of Deputy Baker at pgs. 10-13).

11.     Deputy Island Baker observed Deputy Parker, Deputy Figueroa, and Jack Mills appearing to retreat as Ricky Mills approached them with what Deputy Baker perceived to be a knife in his hand.  Deputy Baker observed what appeared to him to be Ricky Mills jump on top of Jack Mills and then straddle Jack Mills and then began to make stabbing movements towards Jack Mills with a knife.  (Affidavit of Deputy Baker and deposition of Deputy Baker at pgs. 19-22).

12.     Deputy Figueroa observed Ricky Mills on top of Jack Mills and Ricky Mills making what Deputy Figueroa believed to be threatening stabbing motions with a knife towards Jack Mills.  (Deposition of Deputy Figueroa, pgs. 20-22, 25).

13.     Deputy Brian Figueroa felt that Jack Mills' life was in immediate danger, and as a result, he fired two rounds from his firearm at Ricky Mills.  When Deputy Figueroa fired his firearm, he was unsure as to whether any of the two bullets that he fired had actually struck Ricky Mills, as Ricky Mills continued to move towards Jack Mills in a threatening manner in possession of what Deputy Figueroa perceived to be a knife.  As a result, Deputy Figueroa fired a third round.  (Deposition of Deputy Figueroa at pgs. 21-25 and affidavit of Deputy Figueroa).

14.     As Deputy Parker entered the area where Jack Mills and Ricky Mills were located, he observed Ricky Mills on top of Jack Mills with what Deputy Parker believed

to be a knife in his hand and observed Ricky Mills drawing his arm back with the knife as if he was preparing to stab Jack Mills.  Deputy Parker also heard Deputy Figueroa fire two shots at about the same time.  Deputy Parker did not believe that the two shots had any effect on Ricky Mills as he observed Ricky Mills continue what he believed to be a life-threatening attack on Jack Mills.  Deputy Parker felt that Jack Mills' life was in danger, and as a result, he fired one shot from his firearm towards Ricky Mills striking Ricky Mills in the head.  At or about the same time that Deputy Parker fired a shot, Deputy Figueroa, who believed that Jack Mills' life was still in danger, fired again (bringing the total number of shots fired by Deputy Figueroa to 3) as Ricky Mills still appeared to be attacking Jack Mills. (Deposition of Deputy Parker at pgs. 32-34; deposition of Deputy Figueroa at pgs. 19-22, 24-29; and affidavits of Deputies Parker and Figueroa).

15.     Prior to being appointed as Orange County Deputies, Deputy Parker and Deputy Figueroa underwent a background screening, investigation, underwent a voice stress analysis test, a psychological evaluation and were interviewed by a panel of experienced deputies regarding their suitability to serve as deputies.  (Affidavit of Director Margeson and Deputy Figueroa).

16.     Deputies Parker and Figueroa were trained in accordance with the Orange County Sheriff's Office's policies and procedures regarding the arrest process and use of force as described above.  (Affidavit of director Margeson).

### III.    ARGUMENT

### 42 U.S.C. § 1983 Claims and Qualified Immunity

In this case, the Court is called upon to address a question of whether the use of force by DEPUTY PARKER and DEPUTY FIGUEROA against RICKY MILLS was excessive, in violation of RICKY MILLS' constitutional rights, and therefore, if the Defendants are liable under 42 U.S.C. § 1983 (hereinafter referred to as § 1983). Defendants submit that the use of force in this case did not violate MILLS' constitutional rights and assuming *arguendo* that it did, Defendants submit that they are entitled to qualified immunity.

The purpose of qualified immunity is to allow public officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation. McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009).  If the official was acting within the scope of his discretionary authority, the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate.  Id.  Federal courts are obliged to grant qualified immunity unless the plaintiff can demonstrate:  first, that the facts in the light most favorable to the plaintiff establish a constitutional violation by the officer and, second, that it was clearly established at the time of the incident that the actions of the defendants were unconstitutional.  Id.  Courts are now permitted to exercise their discretion in deciding which prong of this inquiry should be addressed first.  Id.  The determination of whether an officer is entitled to qualified immunity is one of law to be made by the court and not submitted to a jury.  Chaney v. City of Orlando, 291 Fed.Appx. 238, 243 (11th Cir. 2008) (Unpublished), *citing* Stone v. Peacock, 968 F.2d 1163, 1165 (11th Cir. 1992).  Significantly, if reasonable public officials could differ on

the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity. Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).

The record evidence shows that on June 14, 2005, Ricky Mills was acting strangely and that Mary Jones and Jack Mills were concerned because Ricky Mills had threatened violence against Jack Mills, i.e. threatened to get a knife and stab him. (Transcript of 911 call made by Mary Jones; Affidavits of Deputies Parker and Figueroa). Mary Jones reported to Deputies Parker and Figueroa that Ricky Mills was a "mental patient" and that he had threatened to get a knife and stab his Uncle, Jack Mills, and had then run to his bedroom. Ms. Jones also suggested that Ricky Mills may have been non-compliant with his medication. (Affidavits of Deputies Parker and Figueroa). According to the record evidence, Deputies Parker and Figueroa went to Ricky Mills' bedroom door to speak with him so that they could better assess the situation. Deputy Parker positioned himself on one side of the bedroom door with his electronic control weapon and Deputy Figueroa positioned him on the other side of the door and unholstered his firearm. Deputy Parker knocked on Ricky Mills' bedroom door and identified himself as an Orange County Deputy Sheriff and requested that Ricky Mills come out of the bedroom so that they could speak with him. Ricky Mills refused to come out of the bedroom and, instead, in a very hostile fashion, yelled at the Deputies to leave. Deputy Parker speaking in normal conversational tones continued to ask Ricky Mills to come outside of the bedroom so that they could speak with him, in an effort to calm Ricky Mills' apparently hostile demeanor. Deputy Parker also called for backup assistance and a supervisor with the intention of waiting until the supervisor and backup assistance arrived. However,

Ricky Mills unexpectedly opened the bedroom door.  When he opened the door, he was naked and holding a knife causing Deputies Parker and Figueroa, who were within arms length of Mr. Mills to be in fear of serious bodily injury or death from Ricky Mills.  They were also concerned that Ricky Mills could injure himself or others with the knife. (Affidavits of Deputies Parker and Figueroa and Depo. of Deputy Parker, pg. 23; Depo. of Deputy Figueroa, pgs. 15-17).  Deputy Parker utilized his ECW on Ricky Mills in an effort to diffuse the situation while Deputy Figueroa began to retreat.  The ECW did not appear to have any effect upon Ricky Mills who began making movements with the knife which resulted in one of the ECW prongs being dislodged from Ricky Mills' body. Ricky Mills then turned and began moving in Deputy Figueroa's direction and Deputy Figueroa began to retreat further by walking backwards.  At the time, Deputy Figueroa believed that Ricky Mills was coming after him, but shortly before actually reaching Deputy Figueroa, Ricky Mills without any prior warning, turned away and began moving in the direction of Jack Mills who was also in the residence.  (Affidavits of Deputies Parker and Figueroa; Depo. of Deputy Parker, pgs. 27-28, 37; and Depo. Deputy Figueroa, pgs. 19-21).  As Ricky Mills was going after Jack Mills, both Jack Mills and Ricky Mills fell to the floor and Ricky Mills began raising his arm in a manner which caused Deputy Figueroa and Deputy Parker to believe that Ricky Mills was attacking Jack Mills with the knife that they had seen earlier.  (Affidavits of Deputies Parker and Figueroa; Depo. Deputy Parker, pgs. 33-34; Depo. Deputy Figueroa, pgs. 19-22).  Two other Orange County deputies, Island Baker and Craig Hall had also arrived at 4549 Conley Street.  They observed Ricky Mills coming after Jack Mills and observed them

fall to the floor with Ricky Mills being on top of Jack Mills.  It was the impression of Deputies Hall and Baker that Ricky Mills had tackled Jack Mills bringing them both down to the floor.  (Affidavits of Deputy Hall and Deputy Baker; Depo. Deputy Hall, pgs. 19-21, 27-29; and Depo. of Deputy Baker, pgs. 10-13).  It was also Deputy Baker's perception that Ricky Mills had a knife and was making what he perceived to be stabbing motions towards Jack Mills.  Deputies Parker and Figueroa also observed what they perceived to be Ricky Mills making stabbing motions with what they believed to be a knife towards Jack Mills while Ricky Mills was on top of Jack Mills.  As a result, both Deputy Parker and Deputy Figueroa believed that Jack Mills' life was in danger and both fired their firearms striking Ricky Mills.  (Affidavits of Deputies Parker and Figueroa; Depo. Deputy Figueroa, pgs. 20-29; and Depo. Deputy Parker, pgs. 32-34).

It is well established that there is no precise test or a "magical on-off switch" to determine when an officer is justified in using deadly force.  Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009), *citing* Scott v. Harris, 550 U.S. 372, 382 (2007). Nor must every situation satisfy certain preconditions before deadly force can be used. Id.  The only perspective that counts is that of a reasonable officer on the scene at the time the incident unfolded.  Id.  The reasonableness inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  Id.at 1166-67, *citing* Graham v. Connor, 490 U.S. 386, 397 (1989).  Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, courts should resist the temptation to judge an officer's

actions with the 20/20 vision of hindsight.  Id.  The Eleventh Circuit has underscored this

principle:  "it is loath to second-guess the decisions made by police officers in the field."

Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007).  Under the law, the threat of danger to

be assessed is not just the threat to officers at the moment, but also to the officers and

other persons.  Id. at 581.

The calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments-in circumstances that are tense,

uncertain, and rapidly evolving about the amount of force that is necessary in a particular

situation.  Menuel v. City of Atlanta, 25 F.3d 990, 996 (11th Cir. 1994).  As in other

Fourth Amendment contexts, however, the reasonableness inquiry in an excessive force

case is an objective one.  An officer's evil intentions will not make a Fourth Amendment

violation out of an objectively reasonable use of force; nor will an officer's good

intentions make an objectively unreasonable use of force constitutional.  Id.

Significantly, the Constitution does not require law enforcement officers to use all

feasible alternatives to avoid a situation where deadly force can justifiably be used.  Id.

Moreover, there are cases which support the assertion that, where deadly force is

otherwise justified under the Constitution, there is no constitutional duty to use non-

deadly alternatives first … Id.  In the instant action, Deputy Parker first used his ECW

which did not stop Ricky Mills from going after Deputy Figueroa or Jack Mills.

Even a private actor is justified in the use of deadly force if he reasonably

believes that such force is necessary to prevent imminent death or great bodily harm to

himself or to prevent the imminent commission of a forcible felony.  Kesinger v.

Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004).  It is also well established that it is constitutionally permissible for an officer to use deadly force when the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.  Carr v. Tatangelo, 338 F.3d 1259, 1268 (11th Cir. 2003).

Based upon the reasonable material facts in this action, even when viewed in the light most favorable to the Plaintiffs, this Court can rule as a matter of law that the conduct of Deputies Parker and Figueroa in using deadly force against Ricky Mills was not unconstitutional when viewed from an objective reasonableness standard based on the circumstances facing them on June 14, 2005.

It is not enough for the Plaintiffs to argue that there were things that could have been done differently which might have prevented the fatal shooting of Ricky Mills.  In virtually every instance where a person has had his or her constitutional rights allegedly violated by a governmental employee, a § 1983 plaintiff will be able to point to something that could have been done differently to prevent the unfortunate incident.  City of Canton v. Harris, 489 U.S. 378, 392 (1989).  However, hindsight is always 20/20 but it is not the measure to determine whether or not a constitutional violation occurred.

The Eleventh Circuit has consistently held that the standard to evaluate the use of deadly force in situations similar to the one in the case at bar, is "objectively reasonable".  See Garczynski v. Bradshaw, supra (Officers entitled to summary judgment in case where they shot an armed and potentially suicidal individual who was shot and killed by the officers after he allegedly pointed a gun in their direction); McCullough v. Antolini, supra (Deputies entitled to summary judgment on the basis of qualified immunity after

shooting and killing a man who drove his vehicle toward a deputy standing nearby in a parking lot); Long v. Slaton, 508 F.3d 576 (11th Cir. 2007) (Deputy did not violate psychotic man's constitutional rights when he shot him dead; considering man's behavior, deputy could not take a chance and hope for the best); Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005) (officer did not use excessive force when shooting the decedent while fearing for his life); Carr v. Tatangelo, 338 F.3d at 1259 (officer who shot at and hit suspect based on his belief that suspect was about to use deadly force against a fellow officer acted in an objectively reasonable manner and was entitled to qualified immunity from § 1983 liability); Kesinger v. Herrington, 381 F.3d 1243 (deputy encountered a highly volatile situation fraught with danger and acted objectively reasonably in using deadly force against suspect, hence, no constitutional violation occurred); Menuel, 25 F.3d at 990 (officers' fatal shooting mentally troubled person after she fired at them was neither objectively unreasonable nor offensive to Fourth Amendment); McCormick v. City of Fort Lauderdale, 333 F.3d 1234 (11th Cir. 2003) (officer's decision to shoot arrestee was objectively reasonable under the circumstances where officer had witnessed an injured victim, hence, had reason to believe that a felony had occurred and suspect was armed with a weapon [a stick]); Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002) (police officers' use of deadly force against a suspect did not constitute a violation of the Fourth Amendment; given the suspect's conduct, probable cause existed to believe suspect had committed a felony involving the threat of serious physical harm); Montoute v. Carr, 114 F.3d 181 (11th Cir. 1997) (officer who shot suspect was entitled to qualified immunity after receiving call reporting fight and gunfire

and seeing suspect with a firearm); <u>Webster v. Beary</u>, 228 Fed.Appx. 844 (11th Cir. 2007) (not published in Fed.Reporter) (deputies did not violate plaintiff's constitutional rights when using deadly force against plaintiff when they perceived danger against self and/or others).

In the case at bar, the totality of the circumstances that Deputies Parker and Figueroa faced make it clear that the actions they took in shooting Ricky Mills was lawful and objectively reasonable.  Additionally, it is respectfully submitted that at the very minimum Deputies Parker and Figueroa had arguable probable cause to use deadly force, and arguable probable cause in and of itself is sufficient to entitle them to qualified immunity.  <u>Montoute</u>, 114 F.3d at 184 (in order to be entitled to qualified immunity, an officer need not have actual probable cause but only arguable probable cause); <u>Garczynski</u>, 573 F.3d at 1167.   Deputies Parker and Figueroa were legally in the household, were exercising their duties as law enforcement officers, tried to control Ricky Mills through non-lethal means (the ECW) and because they perceived Ricky Mills as a danger to Jack Mills, even after they had used the ECW, they utilized deadly force to stop the perceived threat.  Under those circumstances, they had, at a very minimum, arguable probable cause for their actions.

Even if one were to assume for purposes of argument that there exist sufficient material questions of fact as to whether the force used by Deputies Parker and Figueroa was unconstitutional, summary judgment is still appropriate based on qualified immunity. To be entitled to qualified immunity, a public official must show that he was acting within the course and scope of his discretionary authority at the time the allegedly

wrongful conduct occurred.  Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003).

Once it is established that the public official was acting within the course and scope of his

discretionary authority, the burden shifts to the plaintiff to show that qualified immunity

is not appropriate.  Id.  It is undisputed that Deputies Parker and Figueroa were acting

within the course and scope of their duties as deputies when they encountered Ricky

Mills.  Accordingly, in the instant action, the burden shifts to the Plaintiff to show that

Deputies Parker and Figueroa are not entitled to qualified immunity.

When a defendant has moved for summary judgment on the basis of qualified

immunity, the plaintiff may not rely on the facts contained in the complaint, but must

raise genuine issues of material facts to counter the facts supporting the defendant's

motion based on qualified immunity.  Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir.

2009).  The Supreme Court has instructed however, that "to deny summary judgment any

time a material issue of fact remains on the excessive force claim – could undermine the

goal of qualified immunity to avoid excessive disruption of government and permit the

resolution of many insubstantial claims on summary judgment."  Robinson v. Arrugueta,

415 F.3d 1252, 1257 (11th Cir. 2005), citing Saucier v. Katz, 533 U.S. 194, 202 (2001).

Under federal law, qualified immunity shields an officer from suit when he makes

a decision that, even if constitutionally deficient, reasonably misapprehends the law

governing the circumstances confronted by the official.

> "Qualified immunity protects government officials, in their individual
> capacities, from suit unless the law preexisting the defendant official's supposedly
> wrongful act was already established to such a high degree that every objectively
> reasonable official standing in the defendant's place would be on notice that what
> the defendant official was doing would be clearly unlawful given the
> circumstances."  Pace v. Capobiano, 283 F.3d 1275 (11th Cir. 2002).

On June 14, 2005, there was no preexisting case law which would have provided fair warning to Deputies Parker and Figueroa that shooting the decedent under the circumstances outlined in this case would violate clear federal law. To the contrary, as previously discussed, it is constitutionally permissible to use deadly force against a suspect who is an imminent threat of danger to law enforcement officers or others. There was no preexisting case law which would have provided fair warning to them that it was unreasonable to use deadly force against a suspect under the circumstances they faced. To the extent that Plaintiffs may try to compare this case with <u>Mercado v. City of Orlando</u>, 407 F.3d 1152 (11th Cir. 2005), it is submitted that <u>Mercado</u> is distinguishable since Mr. Mercado posed no threat to the police, <u>Id</u>. at 1157, or others. In the instant case Ricky Mills ran towards Jack Mills and either tackled him or fell on top of him and began making some type of a motion which caused Deputies Parker, Figueroa and Baker to believe that Jack Mills' life was in danger. Ultimately, Jack Mills wound up with a cut on his finger and a cut on his foot. Hence, <u>Mercado</u> is inapposite. On the other hand, this case is more along the lines of <u>Kesinger v. Herrington</u>, 331 F.3d 1243 (11th Cir. 2004) where the Eleventh Circuit granted qualified immunity to an officer who used deadly force on an unarmed suicidal man who was perceived by the officer as posing an immediate threat of harm to himself, the officer and others.

Ricky Mills not only represented a threat to himself, but also to Deputies Parker and Figueroa, and the people in the household. In fact, Ricky Mills fell over Jack Mills resulting in Jack Mills' being cut. A non-lethal method (ECW) was first used to try to control Ricky Mills, to no avail. Deputies Parker and Figueroa did not have the luxury of

waiting to see how the volatile situation would progress before using their firearms, after Deputy Parker's use of the ECW was unsuccessful.  Under such tense, uncertain and rapidly evolving circumstances, they were not required to wait and err on the side of caution and thereby risk injury to themselves or others.  Police officers are not required to wait and see, and "hope for the best".  Garczynski, 573 F.3d at 1167, *citing* Scott v. Harris, 550 U.S. at 385.  Deputies Parker and Figueroa reasonably believed that under the rapidly evolving and tense circumstances, they had probable cause to use deadly force.  It is well-settled that a reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983.  Carr, 338 F.3d at 1269.

In Carr the Eleventh Circuit stated, citing a Fourth Circuit opinion, that it declines to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing – particularly where it may cost him his life.  The law states that courts should not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious harm to the officer or others.  Carr, 338 F.3d at 1269, n.19.  Although it is unfortunate that the suspect was seriously injured, § 1983 does not purport to redress injuries resulting from reasonable mistakes.  Id.  Under such rapidly evolving circumstances, the law was not so clearly established that Deputies Parker and Figueroa should be deprived of qualified immunity.  The purpose of the qualified immunity doctrine is to give meaning to the proposition that government officials are not required to err on the side of caution when it comes to avoiding constitutional violations.  Crosby v. Monroe County, 394 F.3d 1328, 1334 (11th Cir.

2004).

## **Defendants are not liable for negligence under Florida law**

Deputies Parker and Figueroa submit that they are entitled to sovereign immunity pursuant to § 768.28(9)(a) Fla.Stat. with regard to Plaintiffs' negligence claims against them. The immunity provided by said statute is both an immunity from liability and an immunity from suit. The benefit of this immunity is effectively lost if the person entitled to assert it is required to go to trial. Willingham v. City of Orlando, 929 So.2d 43, 48 (Fla. 5th DCA 2006). A trial judge must act as a gatekeeper in these circumstances, and should terminate proceedings when the immunity applies. In fulfilling the gatekeeping function when summary judgment is sought, the trial judge should ask whether a reasonable trier of fact could possibly conclude that the conduct was willful and wanton, or would otherwise fall within the exceptions to the statute. Id. If a reasonable jury could not so conclude, summary judgment is appropriate. Id.

In McGhee v. Volusia County, 679 So.2d 729 (Fla. 1996), the Florida Supreme Court held that Florida Statute § 768.28(9)(a), extends a veil of sovereign immunity to government employees when they are acting within the course of their employment, and that such veil is only lifted where the employee's acts fall outside the scope of employment. The record evidence before this Court clearly shows that Deputies Parker and Figueroa were acting within the course and scope of their employment as law enforcement officers. Under McGhee, if there is deemed to be liability for actions of a law enforcement officer under such circumstances, only the employing agency can be liable where the employee was acting within the course and scope of his employment. In

any such situation, either the agency or the employee may be held liable, but both the agency and the employee cannot be held liable.  In the instant action, there is no evidence which would suggest that Deputies Parker or Figueroa was operating other than in their official capacity as deputies.  The Amended Complaint alleges that Deputies Figueroa and Parker were negligent.  Accordingly, under the holding of <u>McGhee</u>, any negligence claims against them should be dismissed.

Police officers, in enforcing the law, are called upon to exercise a degree of judgment in situations that demand on-the-spot decisions and under such circumstances, are accorded a greater leeway than an ordinary citizen in the exercise of that judgment in determining the necessity for, and amount of force required under particular situations … <u>Weil v. City of Miami Beach</u>, 158 So.2d 798-99 (Fla. 3d DCA 1963).  Law enforcement officers are provided a complete defense to an excessive use of force claim when an officer reasonably believes the force to be necessary to defend himself or another from bodily harm [while making the arrest].  <u>City of Miami v. Sanders</u>, 672 So.2d 46, 47 (Fla. 3d DCA 1996), *citing* § 776.05 Fla.Stat.

Plaintiffs' state law claims against Deputies Parker and Figueroa in Counts V and VI are clearly based on allegations of negligence.  However, under Florida law there is no such thing as the negligent use of excessive force.  Deputies Parker and Figueroa used deadly force against Ricky Mills based on their perception of the situation as the events unfolded.  In <u>Sullivan v. Atlantic Federal Savings & Loan Association</u>, 454 So. 2d 52 (Fla. 4th DCA 1994), *rehearing denied Sept. 7, 1994*, the plaintiff, a widower, sought relief against a bank for the fatal shooting of his wife at her workplace as a bank

manager. The appellate court held that an intentional tort claim was insufficient because it was premised on an omission or failure to act. The court specifically stated that "because the complaint in this case purports to establish the intentional tort of assault and battery . . . it is insufficient as a matter of law to state a cause of action against Atlantic Federal (the bank)."

One of the seminal cases regarding negligence vis-à-vis assault and battery is City of Miami v. Sanders, 672 So. 2d 46 (Fla. 3d DCA 1996), *rehearing denied May 8, 1996*. In Sanders, the plaintiff brought an action against the City of Miami for the negligent use of excessive force by its police officers. After a jury trial, the verdict was entered in which the City was found negligent in causing the plaintiff's damages and the plaintiff was found 35% comparatively negligent. The appellate court reversed the verdict and held that an assault and battery is not negligence, for such action is intentional, while negligence connotes an unintentional act. There is no such thing as the negligent commission of an intentional tort. The court cited Sullivan, supra, stating that a cause of action for battery requires a showing of intentional affirmative conduct and it cannot be premised upon an omission or failure to act.

In Quilling v. Price, 894 So. 2d 1051 (Fla. 5th DCA 2005), *rehearing denied Mar. 9, 2005*, the court reversed the lower court's dismissal of the plaintiff's complaint with regard to plaintiff's battery claims against him individually. However, the court reiterated that although the complaint apparently attempted to state a cause of action for negligence, assault and battery are intentional torts, as opposed to torts based on negligence, and therefore the complaint failed to state a cause of action for negligence.

With regard to the wrongful death claims under Florida law against Deputies Parker and Figueroa (Counts V and VI), the Florida Wrongful Death Act limits recovery to statutory survivors who are defined as "the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters." Thompson v. State Farm Mutual Auto. Ins. Co., 670 So. 2d 1070, 1071 (Fla. 3rd DCA 1996) *rehearing denied April 17, 1996.* See also Fla. Stat. §768.18(1). A determination of financial dependency is a prerequisite for any adult, non-parent blood relative wishing to bring a wrongful death action in Florida. Thompson, 670 So. 2d at 1071 *citing* Cinghina v. Racik, 647 So. 2d 289, 290 (Fla. 4th DCA 1994).  When adults claim such dependence, there must be an actual inability to support themselves, and an actual dependence upon someone else for support, coupled with a reasonable expectation of support, or with some reasonable claim to support, from the deceased.  Cinghina, 647 So. 2d at 290.  The state of dependency is determined by the circumstances existing at the time of death.  Id.

In paragraph 4 of the Answers to Interrogatories submitted by Plaintiff, Marie Burks, she states that Ricky Mills' parents are deceased and that he is survived by three adult brothers, Antonio Pace, Jonathan Pace and Allan Pace.  Antonio Pace and Jonathan Pace testified in deposition that they were not dependent upon Ricky Mills for support and that Allan Pace was in prison and had been in prison for a substantial period of time.  Marie Burks, as personal representative of Ricky Mills' estate, testified in her deposition (page 8) that at the time of his death, Ricky Mills was not supporting anyone financially. (See also Depo. Antonio Pace, pg. 15; Depo. Jonathan Pace, pg. 14; Depo. Marie Burks,

pg. 8).  Defendants respectfully submit that this Court can rule as a matter of law that at the time of Ricky Mill's death, he had no "survivors" as defined by the Florida Wrongful Death Act and that accordingly, Counts V and VI of the Amended Complaint against Deputies Parker and Figueroa should fail as a matter of law.

## CONCLUSION

For the reasons set forth above, Defendants Deputies Parker and Figueroa move this Court for entry of summary judgment in their favor and against Plaintiffs.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 30th day of September, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF which will send a notice of electronic filing to the following: John W. Dill, Esq., of Morgan & Morgan, P.A., Attorneys for Plaintiffs, and Frank T. Allen Esq., of The Allen Firm, P.A., co-counsel for Plaintiffs.

<div style="margin-left: 40%;">

s/ Jeanelle G. Bronson
JEANELLE G. BRONSON
Florida Bar No. 266337
WALTER A. KETCHAM, JR.
Florida Bar No. 156630
RAMON VAZQUEZ
Florida Bar No. 196274
Attorneys for Defendant, KEVIN BEARY
GROWER, KETCHAM, RUTHERFORD,
BRONSON, EIDE & TELAN, P.A.
Suite 450, 901 N. Lake Destiny Road
Maitland, FL  32751-4886
Phone: (407) 423-9545
Fax:    (407) 425-7104
e-mail    jgbronson@growerketcham.com
             waketcham@growerketcham.com
             rvazquez@growerketcham.com

</div>