**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARIE BURKS, as Personal**
**Representative of Ricky Mills,**
**deceased, and JACK MILLS,**

          **Plaintiffs,**

**-vs-**                                      **Case No. 6:08-cv-1568-Orl-28GJK**

**KEVIN BEARY, as Sheriff of Orange**
**County, Florida, CHESTER PARKER,**
**and BRIAN FIGUEROA,**

          **Defendants.**
_____

# ORDER

On June 14, 2005, Ricky Mills was shot and killed by two Orange County deputy sheriffs. Plaintiff Marie Burks, as personal representative of Ricky Mills, brings the instant action against those two deputy sheriffs in their individual capacities and against the Sheriff of Orange County in his official capacity.[1] Plaintiff alleges that the Defendants violated the Fourth and Fourteenth Amendments to the U.S. Constitution, and she brings claims for these alleged constitutional violations pursuant to 42 U.S.C. § 1983. She also brings wrongful death claims under state law.

---

[1]The Sheriff named in this suit was Kevin Beary. As noted in the Sheriff's motion for summary judgment, Beary was the Sheriff of Orange County on the date of the incident at issue, but on November 4, 2008, Jerry L. Demings was elected as Sheriff of Orange County and is the current holder of that office. (Doc. 35 at 1 n.1). Pursuant to Federal Rule of Civil Procedure 25(d), "[w]hen a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending . . . [t]he officer's successor is automatically substituted as a party."

The case is now before the Court on the motions for summary judgment (Docs. 35 & 38) filed by the Defendants and Plaintiffs' Responses (Docs. 43 & 44) thereto. Having considered the parties' submissions and the record evidence, the Court concludes that the Sheriff's motion must be granted in part and denied in part and that the deputies' motion must be denied.

## I. Background

On the evening of June 14, 2005, Mary Lou Jones placed a 9-1-1 call regarding Ricky Mills ("Ricky"), who rented a room at Jones's boarding house. Referring to Ricky as "a mental patient getting sick and . . . threatening to cut," Jones requested that a deputy come out to take Ricky to the hospital because Ricky had made threats to hurt himself or someone else. (Tr. of 911 call, Ex. G to Doc. 37, at 1). Jones reported during the call that Ricky had a history of mental illness, that he took medication but must have gone off of it, that he had told his uncle he was going to get a knife, and that he had returned to his room. (Id. at 2, 4).

Deputies Chester Parker and Brian Figueroa responded to the call, with Figueroa arriving at the boarding house just ahead of Parker. (Parker Dep., Ex. A to Doc. 37, at 7; Figueroa Dep., Ex. B to Doc. 37, at 9). When Figueroa arrived, he spoke to Ms. Jones and Ricky's uncle outside the house. (Figueroa Dep. at 9-10). Figueroa and Parker learned that Mills was mentally ill, sometimes takes illicit narcotics, was upset and in the house, and had threatened to get a knife. (Id. at 10; Parker Dep. at 8-9).

Ms. Jones showed Parker and Figueroa where Ricky's room was. (Figueroa Dep. at 11-12; Parker Dep. at 15-16). When Figueroa and Parker arrived at the door to Ricky's

room, Parker stood to the left of the door and Figueroa to the right. (Figueroa Dep. at 12). Parker took out his taser and Figueroa took out his firearm. (Id. at 13; Parker Dep. at 17). Parker began talking to Ricky through the door—identifying himself as a deputy from the sheriff's office—and Ricky yelled for them to leave him alone and told them that he was not going to come out and that they would have to come in and get him. (Figueroa Dep. at 13; Parker Dep. at 17; see also Mary Lou Jones Dep., Ex. D to Doc. 42, at 20). Parker then called for backup units, including a supervisor. (Figueroa Dep. at 14; Parker Dep. at 18-19).

Before any backup units arrived, the door opened and Ricky emerged, naked and holding a knife. (Figueroa Dep. at 15; Parker Dep. at 23). According to Figueroa, Ricky "appeared to be sweating a lot and his eyes were just wide open," with "a crazy look in his eyes." (Figueroa Dep. at 15). Parker described what occurred as "[j]ust very suddenly [he] bursts through the door. Caught me completely off guard. Burst through the door, came out in the hallway . . . ." (Parker Dep. at 23). According to Figueroa, Parker repeatedly told Ricky to drop the knife. (Figueroa Dep. at 15). Ricky did not drop the knife, and Parker tased Ricky; the two taser prongs went into the side of Ricky's torso. (Id. at 16; Parker Dep. at 23-24).[2]

According to Figueroa, the knife remained in Ricky's hand and Ricky made a swinging

---

[2]Although Figueroa testified in his deposition that Parker told Ricky to drop the knife, Parker did not, during his own deposition, mention giving this command. (See Parker Dep. at 23 ("I see that he's completely naked. I see the knife in his right hand. Since I already had the taser turned on and in my hand, my instinct was just [p]ull the trigger on the taser. I thought at any second I was a dead man. . . . So I pulled the trigger on the taser; the taser activated.")). Neither deputy mentions a "drop the knife" command in his affidavit. (See Parker Aff., Ex. A to Doc. 36, ¶ 12; Figueroa Aff., Ex. B to Doc. 36, ¶ 12).

-3-

motion as if he was trying to pull out the taser prongs. (Figueroa Dep. at 16). Ricky then turned to his left and "started coming towards" Figueroa, still with the knife in his hand. (Id. at 16-17; Parker Dep. at 27). Figueroa began walking backward down the hallway away from Ricky. (Figueroa Dep. at 17). Meanwhile, Parker dropped his taser, transitioned to his firearm, and followed Ricky down the hallway. (Parker Dep. at 28). Ricky was running toward Figueroa with the knife in his hand, and then Ricky's uncle, Jack Mills ("Jack"), emerged from a side hallway; at that point, Ricky turned his attention toward Jack and began running toward him. (Figueroa Dep. at 19-21). Ricky and Jack went around a corner and Figueroa followed; when Figueroa turned the corner he saw Ricky kneeling over Jack, who was on his back. (Id. at 21).

Figueroa then saw Ricky pull the knife back as if he was going to stab his uncle. (Id. at 22). At that point, Figueroa fired a shot from his firearm, aiming for "center mass." (Id. at 22, 24). Ricky still had the knife in his hand, and Figueroa thought the shot had missed. (Id. at 22). Ricky looked toward Figueroa after that shot and then lifted up the knife again to try to stab his uncle. (Id. at 27-28). Figueroa then fired another shot, a few seconds after the first. (Id. at 28). At about the same time that Figueroa fired his second shot, Parker fired a shot from his firearm. (Id. at 28-29). After these shots, the knife fell to the ground and Ricky fell down onto his uncle. (Id. at 28, 30). Parker's shot had struck Ricky in the head from a distance of approximately ten feet. (Parker Dep. at 36). Ricky died at the scene.

Jack gives a somewhat different account of the events at issue. Jack testified in his deposition that when the officers were outside Ricky's door, Jack was five or six feet away, positioned to the right of the doorway such that he could see both of the deputies and the

door. (J. Mills Dep. at 75, 85-86). After Ricky refused to come out in response to the calls of the deputies, "all of a sudden the door opened— . . . Ricky pulled the door open[]." (Id. at 77). When Ricky opened the door, he had "a little knife" and was "bent down buck naked standing in front of the door." (Id.). He did not come out of the door; he pulled the door open and was squatting down looking at the floor, with the knife in his hand with the blade aimed toward the floor. (Id. at 77-78). To Jack, it looked like Ricky was "crying out for help." (Id. at 103).

At that point, Parker tased Ricky. (Id. at 79). Jack did not hear either deputy tell Ricky to drop the knife. (Id. at 82). According to Jack, Ricky looked up and then Parker tased Ricky again, causing Ricky to fall to his knees. (Id. at 80-81). At this point Ricky was still inside the room. (Id. at 82). The officers let Ricky get back up, and then they tased Ricky a third time. (Id. at 81, 83). Ricky was bent over and shaking, and he fell forward into a wall, hitting the wall with his head. (Id. at 83-84).

As Ricky fell forward into the wall, he dropped the knife, and Jack never saw Ricky pick the knife back up. (Id. at 84-85, 119). To Jack, it looked like electricity was going through Ricky's body. (Id. at 84). Ricky then straightened up and ran past one of the officers; the officer let him pass by without trying to stop him. (Id.). Ricky then started coming toward Jack. (Id. at 85). Where Jack was standing, there was a hallway, and Ricky hit the wall; Ricky then turned down into the hallway, where there was a step down. (Id.). Ricky missed the step and fell, knocking a big hole into the wall. (Id.). Ricky was staggering after being tased. (Id. at 88). After Ricky hit that wall, he bounced off of it and started staggering toward Jack. (Id. at 89).

-5-

Jack then slipped down—tripping over his own feet—when Ricky was about five feet away, and then Jack heard and saw the first gunshot. (Id. at 89-91, 96). Both deputies were running behind Ricky. (Id. at 91). Ricky fell on top of Jack, and Jack put his legs up to try to keep Ricky from falling. (Id. at 100, 103). According to Jack, the first shot hit Ricky in the head. (Id. at 104). Jack denies that Ricky raised a knife toward him at any time on that day. (Id. at 129). Jack did not see Ricky wield the knife toward any of the deputies or make any threatening movements toward the deputies. (Id. at 130). Both of the deputies were bigger than Ricky, but they did not try to apprehend Ricky when Ricky dropped the knife in the hallway even though he was at arm's length at that point. (Id. at 131).

Plaintiff—Jack's sister and Ricky's aunt and personal representative—filed this lawsuit on September 11, 2008. (Doc. 1). In the Amended Complaint (Doc. 19), Plaintiff sets forth six counts—three counts pursuant to 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments against the Sheriff, Parker, and Figueroa, and three counts under state law for wrongful death against the Sheriff, Parker, and Figueroa. Additionally, Jack, who was wounded during the incident at issue, filed a claim of negligence against the Sheriff, (Doc. 19 at 20-23); however, Jack now concedes that he did not comply with the presuit notice requirements for such a claim and that therefore Count VII should be deemed withdrawn. (See Doc. 43 at 20 n.3; Joint Final Pretrial Statement, Doc. 49, at 2 n.1 & 3-4). Thus, Count VII will be dismissed and will not be discussed in this Order.

## II. Discussion

### A. Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Sw. Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

B.  The Merits of Defendants' Motions

1.  § 1983 Claims (Counts I, II, and III)

### a. Parker and Figueroa

In Counts II and III, Plaintiff brings claims for violation of the Fourth and Fourteenth Amendments against Deputies Parker and Figueroa. In their summary judgment motion, Parker and Figueroa assert entitlement to the defense of qualified immunity. "Qualified immunity protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." Id. In the instant case, there is no assertion that Parker and Figueroa were not acting within their discretionary authority at the time of the events at issue. Thus, "the burden . . . shifts to the plaintiff to show that qualified immunity should not apply." Id.

In determining whether officers enjoy qualified immunity, courts typically employ a two-part process, determining "whether the officer's conduct amounted to a constitutional violation" and "whether the right violated was 'clearly established' at the time of the violation." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The Saucier opinion directed that the two steps of analysis be conducted in order, but, as noted in Lewis, the Supreme Court "recently clarified . . . that the order of the inquiry is fluid, providing [courts] with the flexibility to focus on the determinative question." Id. (citing Pearson v. Callahan, 129 S. Ct. 808 (2009)). In other words, it is now permissible but "not mandated that [courts] examine the potential constitutional violation under Saucier step one prior to analyzing whether the right was clearly established under step two." Id. (citing Pearson).

"The Fourth Amendment's freedom from unreasonable searches and seizures . . . encompasses the right to be free from the use of excessive force in the course of an investigatory stop[] or other 'seizure' of the person." Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004). "In determining whether the officers' force was reasonable, [a court] must determine 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005). "[T]he reasonableness of a 'particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

"[T]here is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force." Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing Scott v. Harris, 550 U.S. 372, 382 (2007)). "[T]he particular facts of each case must be analyzed to determine whether the force used was justified under the totality of the circumstances. '[I]n the end [the court] must still slosh [its] way through the factbound morass of reasonableness.'" Id. (quoting Scott, 550 U.S. at 383) (internal citation and further quotation omitted).

In the instant case, summary judgment cannot be granted on qualified immunity because of disputed issues of material fact. Although "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded," id., here there are disputes as to the circumstances that the officers faced. Figueroa and Parker assert that Ricky Mills "burst" through the door with a knife, was undeterred by being tased, refused to drop the knife, continued to carry the knife, and attempted to stab his uncle with it. However,

Ricky's uncle paints a contrary picture. Jack testified in his deposition that when Ricky opened the door, he was crouched down with the knife pointed toward the floor with the look of a "cry for help" in his eyes; was never told to drop the knife; was tased three times; staggered around hitting walls and dropped the knife after being tased; and never attacked or threatened him or anyone else with the knife. There are also disputes as to whether a knife was found near Ricky's body, and the only evidence as to the size of the knife is Jack's description of it as "a little knife." See, e.g., Samples v. City of Atlanta, 846 F.2d 1328, 1332 (11th Cir. 1988) (noting, in reversing grant of summary judgment for police officer in excessive force case, that "small" knife with three-inch blade allegedly brandished by victim was among the "physical evidence from which a fact finder could infer that . . . [the officer] was excessively violent"). The Court must construe the facts as to what occurred at the scene in Plaintiff's favor at this stage of the case; under Jack's version of the facts, qualified immunity cannot be granted. See, e.g., Mercado, 407 F.3d 1152 (reversing grant of summary judgment on qualified immunity grounds where viewing the facts in the light most favorable to plaintiff, police officer used excessive force in shooting suicidal man in head with a Sage Launcher); Samples, 846 F.2d 1328 (reversing summary judgment on excessive force claim where officer shot and killed 16-year-old, even though there were no other witnesses to the incident). Accordingly, the deputies' motion must be denied with regard to Counts II and III of the Amended Complaint.

### b. The Sheriff

In Count I of the Amended Complaint, Plaintiff brings a § 1983 claim against the Sheriff, alleging that the application of excessive force in this case was caused by a policy,

custom, or practice of the Sheriff. Plaintiff alleges that the Sheriff "engaged as a matter of policy or custom in inadequate screening, training and supervision of its police officers with deliberate indifference to the rights of the County's inhabitants with whom the police come into contact" and "deliberate indifference to the need for better screening, training and supervision." (Doc. 19 ¶ 24).

As Plaintiff recognizes, the doctrine of respondeat superior does not apply in actions under § 1983, and a municipality "may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." Lewis, 561 F.3d at 1293. "Municipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of its inhabitants.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). "To establish a [municipality]'s deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" Id. (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)). "A [municipality] may be put on notice in two ways"—if it is aware of "a pattern of constitutional violations" but "nevertheless fails to provide adequate training" or "if the likelihood for constitutional violation is so high that the need for training would be obvious." Id. "In resolving the issue of [a municipality's] liability, 'the focus must be on the adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies for a particular officer." Id. (quoting City of Canton, 489 U.S. at 390). "It is thus irrelevant what training each specific officer present at the scene was given or retained." Id.

The Sheriff seeks summary judgment on this count, arguing that there is no record evidence establishing a custom or policy of allowing excessive force, a lack of training, or a need for better or different training. In support of the motion, the Sheriff has submitted several affidavits regarding the hiring and training of Orange County deputies. In these affidavits, officials from the Orange County Sheriff's Office attest that, inter alia, all applicants for positions as deputies must go though a background investigation, a voice stress analysis test, a psychological evaluation, and an interview, and before being appointed as a deputy an applicant must complete a certified law enforcement academy and pass a state examination. (Margeson Aff., Ex. B to Doc. 36, ¶¶ 4-8). Additionally, all newly-hired deputies must "undergo a one year field training program in which they are provided classroom and on-the-job training by field training officers in" areas including "criminal laws," "the appropriate use of force in connection with lawful arrests, the use of deadly force," and "search and seizure issues." (Id. ¶ 9; accord Odgen Aff., Ex. G to Doc. 36, ¶¶ 5-6). Thereafter, "deputies continue to receive annual block training and the opportunity to attend specialized courses," (Margeson Aff. ¶ 9), and annual use-of-force training is required, (Ogden Aff. ¶ 8).

As of June 14, 2005, "the Orange County Sheriff's Office had in full force and effect a general order explaining the Orange County Sheriff's Office's policies and procedures with respect to the appropriate and lawful use of force by deputies." (Brown Aff., Ex. F to Doc. 36, ¶ 10; Ogden Aff. ¶ 14). That General Order provided that "[i]t shall be the policy of the agency to use only that degree of force that is necessary to perform official duties" and that "[w]hen deadly force is justified, it shall be considered a last resort." (General Order 470.0,

-12-

Attach. to Ogden Aff., at 1; see also id. at 5).

The only evidence submitted by Plaintiff in response to the Sheriff's summary judgment motion is a "Litigation Report" listing excessive force cases against the OCSO from 2000 to 2007 and exhibits filed at the summary judgment stage in a prior case against the Sheriff in this Court, Jackson v. Beary, Case No. 6:03-cv-881-22KRS. The "Litigation Report" merely lists approximately twenty cases in which excessive force claims were filed and indicates the status of the cases—e.g., "dismissed," "settled," or "discovery pending." (Ex. 1 to Doc. 45). The exhibits from Jackson v. Beary list excessive force complaints received by the Professional Standards Division of the OCSO and indicate the status of those complaints; also included are lists of taser uses for the years 2001, 2002, and 2003. Other than referring to this evidence, Plaintiff seeks to avoid summary judgment on the municipal liability claim by conclusorily arguing a "lack of supervision" because initially there was no supervisor on the scene of the events at issue.

This evidence relied upon by Plaintiff is not sufficient to preclude summary judgment on the claim against the Sheriff. A plaintiff cannot establish a municipal liability claim when he cannot "point to any other incidents involving similar facts." Mercado, 407 F.3d at 1162 (citing Gold, 151 F.3d at 1351). Plaintiff has submitted a list of complaints, but she has not identified similarities in incidents or shown that any complaints of prior similar incidents had merit. As the Eleventh Circuit Court of Appeals has noted, "'the number of complaints bears no relation to their validity.'" Gold, 151 F.3d at 1351 (quoting Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987)). Plaintiff's reliance on a list of complaints and incidents involving use of force is unavailing.

In sum, Plaintiff has not presented evidence creating a fact issue as to the § 1983 municipal liability claim. The Sheriff's motion for summary judgment shall be granted with regard to Count I.

### 2. Wrongful Death Claims (Counts IV, V, and VI)

In Counts IV, V, and VI of the Amended Complaint, Plaintiff brings wrongful death claims against the Sheriff, Parker, and Figueroa. "Because wrongful death did not exist at common law, all claims for wrongful death are created and limited by Florida's Wrongful Death Act." Cinghina v. Racik, 647 So. 2d 289, 290 (Fla. 4th DCA 1994). The Wrongful Death Act ("the Act")—codified at sections 768.16-.26, Florida Statutes—declares and implements "the public policy of the state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer." § 768.17, Fla. Stat. The Act provides a right of action "[w]hen the death of a person is caused by the wrongful act [or] negligence . . . of any person . . . and the event would have entitled the person to maintain an action and recover damages if death had not ensued." Id. § 768.19.

Defendants argue that Counts IV, V, and VI fail as a matter of law because Ricky Mills had no "survivors" within the meaning of the Act—defined as "the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters." Id. § 768.18. Ricky had no spouse or children, his parents are deceased, and there is no record evidence of any blood relatives who were partly or wholly dependent on Ricky for support or services. Ricky did have three adult brothers, but two of them testified in their depositions that they were not dependent on Ricky, (Antonio Pace Dep., Ex. D to Doc. 37, at 15; Jonathan Pace Dep., Ex.

E to Doc. 37, at 14), and the third brother is in prison, (Antonio Pace Dep. at 9-10). Plaintiff cites her own deposition testimony that she did not know whether Ricky gave his grandmother money or not and asserts that this shows that he "could have" been providing financial support to his grandmother. (Doc. 44 at 19 (citing Marie Burks Dep., Ex. E to Doc. 42, at 20-21)).[3] Testimony of lack of knowledge as to support, however, is not sufficient to create a factual issue on this point; the time to present evidence of such support was in response to the summary judgment motion, and none has been presented. Thus, Defendants are correct that there is no evidence that there are any "survivors" within the meaning of the Act.

However, the fact that there are no statutory "survivors" does not mean that there is no Wrongful Death Act claim at all; under the Act, the estate of the decedent can also recover some limited items of damages. The Act provides that an action thereunder "shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors **and estate** all damages, as specified in this act, caused by the injury resulting in death." § 768.20, Fla. Stat. (emphasis added); see also id. § 768.21 ("All potential beneficiaries of a recovery for wrongful death, **including the decedent's estate**, shall be identified in the complaint . . . .") (emphasis added). The Act provides that "[t]he decedent's personal representative may recover for the decedent's estate" certain items of damages, including "[m]edical or funeral expenses due to the decedent's injury or death that have become a charge against her or his estate or that were paid by or on behalf of

---

[3]Earlier in her deposition, Plaintiff testified that Ricky was not supporting anyone financially at the time of his death. (Burks Dep. at 8).

decedent." Id. § 768.21(6)(b). A claim for medical and funeral expenses has been made in this case. (See Ex. VII-A to Joint Pretrial Statement). Because Plaintiff, as the personal representative, is permitted to seek recovery of funeral expenses and other losses on behalf of the estate, Defendants are not entitled to summary judgment on the basis that there are no persons who may properly recover under the Act.

Defendants also make other arguments for judgment in their favor on these claims. Examination of the nature of wrongful death claims and their relationship to Count I, II, and III is required to analyze these arguments.

As earlier noted, the Act provides a right of action "[w]hen the death of a person is caused by the wrongful act [or] negligence . . . of any person . . . and the event would have entitled the person to maintain an action and recover damages if death had not ensued." § 768.19, Fla. Stat. While the § 1983 claims being asserted in Counts I, II, and III of this case are "survival" claims in which Plaintiff seeks to vindicate the alleged violations of Ricky's constitutional rights and recover for *his* injuries under federal law, the Wrongful Death Act provides the survivors and estate of a decedent with a state law remedy *for their own losses.* See, e.g., Gilmere v. City of Atlanta, 864 F.2d 734 (11th Cir. 1989) (noting the two different types of claims in a case in which a wrongful death claim was not pled).

The remedy provided by the Act is, of course, dependent on proof that the decedent's death was "caused by the wrongful act [or] negligence" of another—a predicate act of some kind that should be identified in the complaint. "Wrongful acts" include intentional acts; thus, recovery for both intentional torts and negligence may be obtained under the Act. Counts IV, V, and VI are, however, confusingly pled; these claims are unnecessarily limited in some

-16-

respects and unduly broad in others.  Count V is labeled "negligence wrongful death claim" against Parker; Count VI is labeled "negligence wrongful death claim" against Figueroa; Count IV is labeled "negligence wrongful death claim . . . under 42 U.S.C. § 1983" against the Sheriff; and all three claims allege only negligent conduct.  While Plaintiff could have predicated her wrongful death claims on the constitutional violations alleged in Counts I, II, and III, she seemingly has pled state law negligence claims as the basis for the wrongful death claims, though the reference in Count IV to § 1983 is confusing.

Parker and Figueroa assert that they cannot be held liable on the wrongful death claims against them because of section 768.28(9)(a), Florida Statutes, which provides in part that "[n]o officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, even, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  They also aptly assert that the Amended Complaint alleges "negligent use of excessive force," which fails to state a claim under Florida law.  See City of Miami v. Sanders, 672 So. 2d 46, 48 (Fla. 3d DCA 1996) ("[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort.").  And, with regard to Count IV, the Sheriff argues that a judicially-created discretionary function exception bars liability for negligent training.

Although the wrongful death claims are confusingly pled, at this stage of the litigation the case is not about pleading but about proof.  To the extent Plaintiff has potentially

-17-

actionable wrongful death claims available to her under the circumstances of this case, those claims may proceed to trial. That being said, the parameters of those potential claims are as follows.

First, regardless of the underlying basis for the wrongful death claims, the only damages that may be recovered on those claims are those types of damages that are recoverable on behalf of an estate as set forth in section 768.21, Florida Statutes.

Second, if Plaintiff bases her wrongful death claims on the alleged constitutional violations in Counts I, II, and III, the municipal liability rules of § 1983—not those of § 768.28, Florida Statutes—apply, and the Sheriff cannot be held vicariously liable for the actions of the deputies. And, because no evidence has been presented supporting the existence of a municipal policy causing any constitutional violation, any wrongful death claim based on the constitutional violation alleged in Count I also fails. Thus, insofar as Plaintiff's wrongful death claims are grounded in the constitutional violations alleged in Counts I, II, and III, Count IV against the Sheriff fails; however, Counts V and VI against the deputies may proceed to trial.

Third, if Plaintiff bases her wrongful death claims on a negligent or intentional wrongful act under state law, the municipal liability provisions of section 768.28, Florida Statutes, apply. Under section 768.28(9)(a), the deputies may be held personally liable if they "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." If the deputies acted without such purpose, however, they cannot be held liable on the wrongful death claim but the Sheriff can be held vicariously liable for their actions. To the extent Plaintiff's wrongful death claim is based on the Sheriff's

alleged negligence with regard to training or failing to train, Count IV fails. Insofar as the Sheriff's alleged negligence pertains to policy decisions regarding what to include in the training of deputies, the claim is barred by the judicially-created discretionary function exception to section 768.28's waiver of sovereign immunity. See Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) (explaining that "[a] city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning" and therefore a claim challenging such a decision is barred by the discretionary function exception to the waiver of sovereign immunity in section 768.28, Florida Statutes). And, to the extent Plaintiff alleges negligence in the implementation of training, no evidence has been presented creating a fact issue as to any such negligence.

In sum, though Plaintiff's wrongful death claims are inartfully pled, they appear to remain viable at least to the extent that Counts II and III of the Amended Complaint survive summary judgment and perhaps on other bases as well. Thus, these claims may proceed to trial. The parties shall be prepared to address Counts IV, V, and VI in more depth at the final pretrial conference so that the issues regarding these claims may be properly framed for trial. The motions for summary judgment as to these counts are denied.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion for Summary Judgment (Doc. 35) filed by Defendant Kevin Beary is **GRANTED** in part and **DENIED without prejudice** in part. The motion is **granted** insofar as it pertains to Counts I and VII of the Amended Complaint and is **denied without**

**prejudice** insofar as it pertains to Count IV.

2. The Motion for Summary Judgment (Doc. 38) filed by Defendants Chester Parker and Brian Figueroa is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida this 29th day of April, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record